SEALED MATTER

AUSA: Frances Lee Carlson  Telephone: 313-226-9696
Special Agent: Mark A. Kroger  Telephone: 313-965-5375

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

United States of America,

       Plaintiff,

v.

FADI HAMMOUD

       Defendant(s).

Case: 2:14-mj-30362
Judge: Unassigned,
Filed: 07-22-2014 At 11:55 AM
RE: SEALED MATTER (EOB)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of <u>September 2011-April 2013</u>, in the county of <u>Wayne</u> in the <u>Eastern</u> District of <u>Michigan</u>, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

FILED
JUL 22 2014
CLERK'S OFFICE
DETROIT

_____
Complainant's signature

Special Agent Mark A. Kroger
Printed name and title

Sworn to before me and signed in my presence.

Date: 7/22/14

_____
Judge's signature

City and state: Detroit, Michigan

Magistrate Judge David R. Grand
Printed name and title

# AFFIDAVIT

I, Mark A. Kroger, being duly sworn, depose and state the following:

1. Since 2012, I have been employed as a Special Agent of the Federal Bureau of Investigation (FBI). I am currently assigned to the Detroit Office of the FBI, and my duties include investigating criminal violations including bank and wire fraud. Prior to working with the FBI, I was a mortgage banker for five years.

2. The facts set forth in this affidavit are based on my personal knowledge and investigation, which includes reviewing documents and records, and interviewing individuals having direct knowledge of these events. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause to believe that FADI HAMMOUD knowingly executed a scheme to obtain funds under the custody and control of a financial institution by means of false or fraudulent pretenses, representations, or promises, in violation of 18 U.S.C. § 1344 (bank fraud) and knowingly executed a scheme to obtain money by means of false or fraudulent pretenses, representations, or promises, through the use of the Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud).

3. In September 2012, the Detroit office of the FBI initiated an investigation into short sale and insurance fraud schemes being perpetrated by HAMMOUD, a resident of Dearborn, Michigan. The schemes involved the fraudulent short sale of HAMMOUD's personal residence located at 7601 Miller Road, Dearborn, Michigan in 2012, and a fraudulent insurance claim submitted by HAMMOUD in January 2013 for water damage sustained as a

1

result of flood damage inside that residence.

4. In 2011 and 2012, HAMMOUD devised and executed a scheme to defraud Wells Fargo Bank by fraudulently selling his primary residence via short sale to an acquaintance he recruited to act as a strawbuyer. The purpose of the scheme was to lower HAMMOUD's debt obligation and retain the home as his primary residence, after defaulting on his mortgage in July 2011. In furtherance of and to conceal his schemes, HAMMOUD used the strawbuyer and relatives to keep records out of his name, facilitate financial transactions, and to file a fraudulent insurance claim. HAMMOUD also used several limited liability companies that he controlled or owned to facilitate and conceal his schemes. These companies included: Prompt Property Service; Quick Financial, and United Realty Group. The fraudulent short sale resulted in a loss of approximately $138,563 to Wells Fargo, a federally-insured financial institution. The fraudulent insurance claim resulted in a loss of approximately $347,748 to Grange Insurance.

### Fraudulent Short Sale of 7601 Miller Road, Dearborn, MI

5. In November 2007, HAMMOUD obtained a $342,000 mortgage from Wachovia Bank to purchase 7601 Miller Road, Dearborn, Michigan. In 2008, Wells Fargo, a federally insured financial institution, acquired Wachovia Bank. In July 2011, HAMMOUD defaulted on the mortgage. In August 2011, HAMMOUD began attempting to negotiate a short sale with Wells Fargo. There was also a second mortgage of $80,000 held by National City Bank.

6. I obtained documents from Wells Fargo related to the short sale of 7601 Miller Road. Many of these documents were faxed from United Realty Group and Quick Financial to Wells Fargo. During the course of the investigation, I have reviewed numerous documents containing HAMMOUD's handwriting, and based on my review, the short sale documents

faxed to Wells Fargo contained handwriting I recognize as HAMMOUD's, evidencing his involvement in the facilitation and negotiation of the short sale. Business entity documents filed with the State of Michigan for United Realty and Quick Financial list HAMMOUD as the owner of both companies.

7. From August 2011 through March 2012, multiple purchase agreements were signed by the seller, HAMMOUD, and buyer, Billy Mukhal (Mukhal). The purchase agreements were faxed from Quick Financial and United Realty to Wells Fargo. The purchase agreements started as low as $125,000 and by closing, had increased to $226,000. In a hardship letter to Wells Fargo dated March 2012, HAMMOUD explained the value of 7601 Miller Road was "only worth about $125,000 today." Investigation revealed that Wells Fargo valued the home at approximately $220,000, which was the basis for the increase in final sales price. Based on my training and experience, the various purchase agreements were HAMMOUD's attempts to purchase the house back from Wells Fargo at an artificially low price.

8. On February 1, 2013, I interviewed Dennis Brooks (Brooks), President of Satori Corporation (Satori), which is a hard money lender. Brooks advised that in approximately May 2012, HAMMOUD approached him for a loan to buy his house back from the bank. HAMMOUD told Brooks he believed he could buy the house back for $150,000, but that it was worth $300,000. Brooks later learned from HAMMOUD that Wells Fargo valued the home at approximately $225,000 and would not sell it for less than that amount.

9. In July 2012, HAMMOUD told Brooks that he was going to sell the house to Mukhal because the bank would not sell it to him directly. Later that month, Brooks issued a loan commitment in the name of Mukhal for $125,000. The loan was a six-month balloon note maturing in February 2013. Mukhal told Brooks that he would pay the difference between the

3

sales price ($226,000) and Satori's loan ($125,000) with cash from his business, R&B Detailing (R&B).

10. On August 2, 2012, a closing was held for 7601 Miller Road. At closing, Brooks noticed that Mukhal had obtained a second mortgage from Axiom Investment Corporation (Axiom) instead of bringing his own cash. Mukhal told Brooks that he obtained the second mortgage because he needed to keep the cash in his business. At the time of closing, HAMMOUD's nephew, Hussein Hammoud was the owner of record of Axiom. Axiom's bank records show that prior to closing, HAMMOUD deposited checks and cash into Axiom's bank account in order to accumulate the necessary funds for closing.

11. On August 1 and 2, 2012, two cashier's checks listing Axiom as the remitter ($95,000 and $2,228) were drawn on Axiom's bank account. According to Mukhal, HAMMOUD brought these checks to closing. On March 11, 2013, paperwork was filed with the State of Michigan and Comerica Bank designating the official transfer of the ownership of Axiom and its bank account to HAMMOUD.

12. On June 4, 2012 (prior to Wells Fargo approving the short sale) and on August 2, 2012 (the day of the closing), HAMMOUD and Mukhal signed a Short Sale Affidavit. The affidavit states that the signatories "hereby certify and affirm under penalty of perjury, that to the best of their knowledge and belief; a) The sale of the Mortgaged Premises is an "arm's length" transaction, between the parties who are unrelated and unaffiliated by family, marriage, or commercial enterprise; b) There are no agreements, understandings or contracts between the parties that the Seller will remain in the Mortgaged Premises as a tenant or later obtain title or ownership of the Mortgaged Premises; ...d) There are no agreements, understandings or contracts relating to the current sale or subsequent sale of the Mortgaged

4

Premises that have not been disclosed to the Lender; ...i) the property will not be rented to the Seller after the closing of the subject real estate purchase contract."

13. On February 21, 2013, Brooks voluntarily recorded a meeting with HAMMOUD. The purpose of this meeting was to discuss the loan in Mukhal's name since the balloon payment was due. HAMMOUD stated that he owed Satori Corporation $125,000. When Brooks suggested that Mukhal was the individual responsible for the mortgage, HAMMOUD responded the he and Mukhal are "one person." Brooks rejected HAMMOUD's repeated attempts to refinance the loan and requested that the mortgage be paid in full. Brooks then asked HAMMOUD about the monthly payment on the loan, which was due. HAMMOUD prepared a check in the amount of $1,000 and provided it to Brooks. The check was drawn on R&B's Comerica Bank account on which HAMMOUD and Mukhal were co-signers.

14. On March 13, 2014 and May 1, 2014, I interviewed Mukhal. Mukhal advised that in approximately February 2012, HAMMOUD approached him and requested that Mukhal allow HAMMOUD to put the title of 7601 Miller Road, Dearborn into Mukhal's name for approximately three to six months.

15. In approximately July 2012, HAMMOUD and Mukhal visited Brooks about a loan to purchase the home. HAMMOUD completed the required paperwork to obtain a loan in Muhkal's name and handled the majority of the communication with Brooks.

16. HAMMOUD explained to Mukhal that it would be helpful in obtaining the loan for Mukhal to form an LLC. At HAMMOUD's direction, Mukhal formed R&B. HAMMOUD and Mukhal went to Comerica Bank and opened a bank account as co-signers in the name of R&B. Mukhal, a part-time car detailer, advised that he does not use the R&B bank account for income earned from detailing cars or for any other purpose. Once the account was opened,

5

HAMMOUD requested blank checks with Mukhal's signature. Mukhal provided approximately six checks which he signed and wrote the number $1,500.00 in the amount line. The checks were later completed by HAMMOUD and used to pay the monthly loan payments to Satori Corporation. Mukhal advised that he never moved into or resided at 7601 Miller Road and that HAMMOUD possesses an unrecorded Quit Claim Deed transferring Mukhal's purported interest back to HAMMOUD.

17. On April 16, 2014, HAMMOUD visited Mukhal twice. HAMMOUD told Mukhal that they would need to keep their stories "straight" and that he would "create" someone to buy the house. HAMMOUD asked Mukhal not to speak to law enforcement.

18. Mukhal voluntarily provided a recording of one of the meetings. In the recording, HAMMOUD explained that he and Mukhal were "in the same boat" and that if HAMMOUD were caught, then Mukhal would be too. HAMMOUD suggested that if questioned by the FBI, Mukhal, should say that he was aware of the short sale and that he lived in the house for about six months during which he asked HAMMOUD to help him with renovation and repairs to sell the house. HAMMOUD believed that this story would convey the truth, but not give a clear picture of who was living in the house since the laws prohibit any close association between the buyer and the seller of a short sale home. HAMMOUD explained that he was talking to Mukhal to warn him about what may be forthcoming and to be careful of his statements; otherwise, they both may end up in jail. HAMMOUD promised to take Mukhal's name off the title to spare him any future problems. HAMMOUD said that he may be held accountable for continuing to live at 7601 Miller Road. HAMMOUD believed the FBI was unsuccessful in identifying the money trail even after investigating his bank accounts and title company transactions. HAMMOUD believed that the use of his nephew's name, Hussein, was useful for

concealing the money trail. I believe this was most likely a reference to the designation of Hussein as the owner of Axiom for the purpose of concealing the source of the funds necessary for the closing. HAMMOUD also told Mukhal that he considered himself to be a "big fish" with respect to his mortgage dealings over the past seven years.

19. Based on my training and experience, lenders such as Wells Fargo would not have approved the short sale from HAMMOUD to Mukhal had they known that the sale of 7601 Miller Road was not an arms-length transaction and that there was an agreement between HAMMOUD and Mukhal that HAMMOUD would continue to live in the property.

### **Fraudulent Insurance Claim**

20. In May 2013, I interviewed Laura Kozlowski (Kozlowski), Insurance Agent, Grange Insurance, Allen Park, Michigan. On August 8, 2012, an individual identifying himself as Mukhal called Kozlowski's office to apply for homeowners insurance for 7601 Miller Road. The application was returned in person and contained handwriting that I recognize as belonging to HAMMOUD. The handwritten portion identifies Axiom as the mortgagee and lists HAMMOUD's business address for Axiom. HAMMOUD, posing as Mukhal, visited Kozlowski's office several times between August 2012 and May 2013 to make cash payments on the policy. I showed Kozlowski a photographic lineup and she identified HAMMOUD's picture as the individual who came to her office posing as Mukhal. Mukhal advised me that he had never met Laura Kozlowski or visited her office in Allen Park.

21. Grange Insurance provided records related to a flood claim at 7601 Miller Road, including a recording of the initial claims call. On January 14, 2013, HAMMOUD, purporting to be Mukhal, called to report a water damage claim and provided HAMMOUD's telephone number as the contact number. HAMMOUD informed Grange Insurance that a water pipe in

his upstairs bathroom had burst and flooded the home. The initial insurance claim was made shortly before the balloon payment to Satori Corporation was due.

22. I identified HAMMOUD as the caller by comparing known recordings of HAMMOUD with Mukhal's voice, which I am familiar with from interviews and telephone conversations with Mukhal. HAMMOUD informed Grange Insurance that a water pipe in his upstairs bathroom had burst and flooded the home. The initial insurance claim was made shortly before the balloon payment to Satori Corporation was due.

23. Brooks advised in his interview that prior to February 1, 2013, HAMMOUD told him that he was trying to obtain financing for Mukhal in order to pay off the loan, but was unsuccessful. HAMMOUD was referencing the 6 month balloon note, due to mature in February 2013.

24. After 7601 Miller Road flooded, Mukhal advised that HAMMOUD filed the water damage claim, received the claims checks, signed Mukhal's name, and deposited the money into accounts controlled by HAMMOUD. After Mukhal found out about the insurance claim, HAMMOUD told Mukhal the money was used for repairs, rent, dry cleaning, and to purchase vehicles, some of which were shipped overseas.

25. Mukhal was shown a lease agreement dated January 15, 2013 that was submitted to Grange Insurance for reimbursement of rent. The lease agreement was purportedly between Landlord, Nadia Abdallah, and Tenant, Mukhal, for property address 7107 Oakman, Dearborn, MI. The monthly rent was $3,500. Mukhal stated he never rented 7107 Oakman and identified the writing and his signature on the agreement as forgeries. Nadia Abdallah, HAMMOUD's sister, has resided at 7107 Oakman, Dearborn, Michigan, for almost ten years. I interviewed Abdallah who stated that she and her husband never rented their home to anyone and had never

heard of Mukhal. Abdallah also had no knowledge of the lease agreement and had never seen it before. She identified the signature on the lease agreement that purported to be hers, was a forgery. The header on the lease agreement indicates it was faxed to Grange Insurance from United Realty's fax. The fax cover page also contained handwriting that I recognized as HAMMOUD's.

26. Mukhal provided me with a copy of a personal property inventory sheet submitted to Grange Insurance, which HAMMOUD gave to Mukhal. Mukhal advised that the personal property listed on the inventory sheet belonged to HAMMOUD. The document was faxed to Grange Insurance from United Realty's fax. The fax cover page contained handwriting that I recognized as HAMMOUD's.

27. I showed Mukhal copies of dry cleaning invoices from Macy's Cleaners (a dry cleaning company next door to HAMMOUD's place of business) and an estimate from Royal Furniture, which were all in Mukhal's name and submitted to Grange Insurance as part of the claim. Mukhal advised that he did not obtain the invoice and estimate and that HAMMOUD told Mukhal that he obtained a quote from Royal Furniture. These documents were faxed to Grange Insurance from United Realty's fax. The fax cover page contained handwriting that I recognized as HAMMOUD's.

28. Dan Bailey is the plumber with whom HAMMOUD contracted to replace the broken supply line in the bathroom at the 7601 Miller Road property. Bailey told me that it was his opinion that someone intentionally unscrewed the nut of the supply line, which caused the flood to occur.

29. Mukhal voluntarily provided a recording of a conversation between Mukhal and HAMMOUD. In the recording, HAMMOUD suspected the FBI was trying to link the short

9

sale fraud to the "insurance job"; however the reality is that the insurance company came in, inspected the house, and verified the damage that was incurred by the broken pipe and it was all legal and justifiable.

30. Grange Insurance provided copies of eight claims checks totaling $347,748.46, which were paid as a result of the claim filed in Mukhal's name. Erik Hobson, Claims Adjuster, Grange Insurance, advised that each claims check was mailed via the United States Postal Service from Columbus, Ohio to Billy Mukhal at 7601 Miller Road, Dearborn, Michigan. The checks paid by Grange Insurance were as follows:

| Date | Payable To | Amount | For (as written on face of check) |
|---|---|---|---|
| 1/17/2013 | Billy Mukhal | $1,000 | Advance Payment |
| 1/30/2013 | Billy Mukhal | $17,500 | 4 months rent and security deposit |
| 2/14/2013 | Billy Mukhal and Macy's Dry Cleaning and Laundry | $32,428.66 | Clothing cleaning bill |
| 2/20/2013 | Billy Mukhal and Axiom Investment Corp | $14,561.60 | Water mitigation |
| 2/21/2013 | Billy Mukhal and Select One Contents Restoration Services | $47,185.42 | Cleaning Invoice from Select One |
| 2/21/2013 | Billy Mukhal and Axiom Investment Corp | $160,122.44 | ACV* of Structure |
| 3/8/2013 | Billy Mukhal | $10,000 | Content Advance |
| 3/29/2013 | Billy Mukhal | $54,950.34 | ACV |

*ACV stands for "Actual Cash Value"

31. Bank records revealed six of these checks were deposited into accounts controlled or owned by HAMMOUD. The check payable to Billy Mukhal and Select One was deposited by Select One who then paid HAMMOUD approximately $20,000.

32. The check issued February 21, 2013, payable to Billy Mukhal and Axiom for $160,122.44, was deposited into Axiom's Comerica Bank account. On March 11, 2013, paperwork was filed with the State of Michigan and Comerica Bank designating the official

transfer of the ownership of Axiom and its bank account to HAMMOUD. That same day, HAMMOUD withdrew $153,546.57 from Axiom's account, the source of which was the claim check from Grange Insurance. Out of that withdrawal, $126,267.57 was paid to Satori Corporation via a cashier's check, remitter 7601 Miller Payoff. The remaining funds were used to purchase seven vehicles, some of which were shipped overseas.

33. Erik Hobson, Claims Adjuster, Grange Insurance, advised me that the homeowners insurance policy for 7601 Miller Road in Mukhal's name would not have been written had Grange Insurance known that Mukhal did not actually own the property.

34. Based on the foregoing, there is probable cause to believe that FADI HAMMOUD knowingly executed a scheme to defraud Wells Fargo Bank and Grange Insurance in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1344 (bank fraud).

Mark A. Kroger
Special Agent, Federal Bureau of Investigation

Sworn and subscribed before me this 22nd day of July 2014.

HONORABLE DAVID R. GRAND
United States Magistrate Judge
Eastern Judicial District of Michigan

11